UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08-CV-209-H

**NORMAN NORRIS**                                                                               **PLAINTIFF**

**V.**

**PREMIER INTEGRITY SOLUTIONS, INC.**                          **DEFENDANT**

**MEMORANDUM OPINION**

Plaintiff, Norman Norris, challenges the direct observation method of urine collection from pretrial detainees. Plaintiff seeks to represent the class of persons given such drug tests by Defendant, Premier Integrity Solutions, Inc. In response, Defendant has moved to hold in abeyance any decision on class certification until the Court has considered the dispositive motions of the parties. Subsequently, both Plaintiff and Defendant have moved for summary judgment.

For the reasons that follow, the Court finds that the method of urine collection is reasonable and, therefore, did not violate Plaintiff's constitutional rights. As a result, the Court need not consider Plaintiff's motion to certify a class.[1]

**I.**

The parties do not dispute the material facts of this case. On or about December 12, 2005, Plaintiff, who happens to be a lieutenant with the Louisville Metro Corrections Department, was arrested on charges of sexually abusing his stepdaughter. The Commonwealth

---

[1] The Sixth Circuit has "consistently held that a district court is not required to rule on a motion for class certification before ruling on the merits of the case." *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 616 (6th Cir. 2002).

of Kentucky held Plaintiff in various forms of custody for some time before eventually dropping the charges. Initially, Plaintiff was incarcerated in the Bullitt county and Oldham county jails for a total of approximately thirty days. He was then placed on home incarceration for approximately six months. On July 25, 2006, Plaintiff was released from home incarceration and placed in Kentucky's Pretrial Services Conditional Release Program. To gain this additional freedom, Plaintiff consented to numerous conditions of release, including random drug testing. During his pretrial release term, Plaintiff was required to submit to five drug tests over approximately a four month period. Plaintiff has brought this action complaining about the manner in which the state administered those drug tests.

Defendant is a private corporation employed by the Commonwealth to conduct drug tests of participants in the pretrial release program. It does nothing more than conduct the tests that the Commonwealth orders. Kentucky requires that Defendant employ what is known as a "direct observation" method of collecting urine from participants. "Direct observation" requires the participant enter a restroom with a same-sex employee of Defendant, that the participant lower his pants below his knees while holding any baggy shirts above his waist, that the participant hold a cup for collection in one hand, and that the monitoring employee watch the urine leaving the body of the participant. Obviously, such a method requires the employee to observe the participant's genitals.

Plaintiff alleges harm that includes emotional damage and development of extreme difficulty urinating in a public restroom.

## II.

Plaintiff brings this suit under 42 U.S.C. § 1983, claiming that Defendant, while acting

under the color of state law,[2] violated Plaintiff's Fourth and Fourteenth Amendment right to be free from unreasonable searches.  Here, Plaintiff, seeking to represent thousands of releasees, questions only the method by which the Commonwealth of Kentucky conducts all drug tests for its pretrial release program, not the drug testing itself.[3]

### A.

To be certain, "[c]ompelled urine tests are searches for the purposes of the Fourth Amendment." *BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 206 (D.C. Cir. 2009).  For the government to compel a citizen to exercise a bodily function on command and then test that function for incriminating evidence requires the citizen to surrender considerable constitutional rights.  However, this case is not about whether conducting the tests was an unreasonable search.  Plaintiff's complaint only alleges constitutional violations because of the *method* of collection, not the *fact* of collection.  Indeed, Plaintiff unequivocally admits, "Let it be clear: Plaintiff does not complain in this case of his incarceration, or that he was tested for drugs." (Pl.'s Resp. to Def.'s Mot. Summ. J. 2.)  Therefore, the Court will consider only the constitutionality of the method used for administering such tests.[4]

---

[2] Given the nature of the control exercised over Defendant by the Commonwealth of Kentucky, the Court will assume that Defendant was acting under the color of state law for purposes of this opinion.

[3] Although Defendant makes a strong argument that Plaintiff's Fourth Amendment claim has been waived because Plaintiff consented to the pretrial release conditions including drug testing by direct observation, the Court does not consider this argument in making its decision.  There is some ambiguity over whether consent given in order to obtain pretrial release can be sufficient to waive Fourth Amendment claims and there appears to be a limited factual dispute over Plaintiff's understanding of the method of testing when consent was given.  However, the Court will consider consent as it is relevant to determine the reasonableness of the search as detailed below.

[4] Otherwise, the Court would analyze whether some exception to the generally accepted principle that the government must obtain a search warrant or have reasonable suspicion before a search can be conducted absent "special needs" for the search exists.  *See Wilcher v. City of Wilmington*, 139 F.3d 366, 374 (3d Cir. 1998).  However, even if it were necessary for the Court to consider whether "special needs" made the testing constitutional in the absence of a search warrant or reasonable suspicion, special needs exist.  These tests are conducted on pretrial release participants.  The government has a significant interest in ensuring that these individuals show up for trial,

In *Wilcher*, the Third Circuit noted that a challenge solely to the method of testing is "distinct and severable from [the issues] that govern reasonable suspicion testing generally." *Id.* (quoting *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 975 (D.C. Cir. 1990)). In these circumstances, this Court applies "the Fourth Amendment's reasonableness test solely to the direct observation method utilized by [Defendant] and not to the broader issue of compulsory drug testing." *Id.*[5] To determine reasonableness, the Court must weigh three factors: "(1) the nature of the privacy interest upon which the search intrudes; (2) the extent to which the search intrudes on the [plaintiff's] privacy; and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means employed by the government for meeting that concern." *Id.*

**B.**

Under the first prong of the analysis, the Court considers Plaintiff's legitimate expectation of privacy. The *Wilcher* court held that "firefighters enjoy only a diminished expectation of privacy" because they work in a "highly regulated industry, and because they had consented to random drug testing in their collective bargaining agreement." *Id.* If firefighters have a diminished expectation of privacy for these reasons, certainly the same is likely true of pretrial detainees.

First, Plaintiff has been arrested and is legitimately subject to the custody of the

---

that they refrain from breaking any laws while on pretrial release and that the public is safeguarded from potential harm caused by the drug usage of pretrial releasees. These interests are sufficient to allow a search absent reasonable suspicion so long as that search meets the general "reasonableness" test of the Fourth Amendment.

[5] Plaintiff has argued at length that the direct observation protocol used by Defendant is equivalent to a strip search and should be reviewed accordingly. The Court need not consider this argument because "the balancing inquiry remains the same regardless of how one characterizes the search." *BNSF Ry.*, 566 F.3d at 208 (citing *Bell v. Wolfish*, 441 U.S. 520, 559-560 (1979)).

government. To put it mildly, prisoners have a significantly more regulated relationship with the state than one employed as a firefighter. While the government has an interest in keeping firefighters drug free to better perform their jobs, it has a much greater responsibility to prevent pretrial releasees from engaging in illegal behavior, missing their court dates, and endangering the public during their release. *See United States v. Salerno*, 481 U.S. 739, 747 (1987) (holding that the government may permissibly go so far as to detain pretrial defendants in order to prevent future crimes because "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling").

Moreover, Plaintiff, who was represented by counsel at all relevant times, consented to the conditions of his release, including random drug tests, and was informed of the manner of testing.[6] Here, consent does not mean that Plaintiff has waived his rights. As in *Wilcher*, the importance of consent is that it shows that Plaintiff, in fact, should have expected diminished privacy.

Perhaps most importantly, Plaintiff's alternative to the pretrial release conditions was to return to jail or stay under 24 hour house arrest. Those alternatives are considerably more invasive of Plaintiff's privacy than submitting to a directly observed urinalysis. *See United States v. Barnett*, 415 F.3d 690, 691-92 (7th Cir. 2005) (noting that prisoners frequently waive their Fourth Amendment rights in order to gain probation because staying in state custody is

---

[6] Although there is some dispute regarding whether Plaintiff understood the manner of testing that would be administered, it appears undisputed that Plaintiff was informed that he would be "closely observed during the urination process," that he "must allow the technician full observation," and that he may be asked to "remove or hold up any loose or baggy clothing that may obstruct the view of the collection process." Clearly, Plaintiff was put on notice of the general procedures and he consented to those procedures.

more intrusive of one's privacy than highly supervised probation).[7] Thus, Plaintiff made an informed decision to give up his expectation of privacy in exchange for avoiding the intense loss of privacy that would result from returning to jail or house arrest.

The foregoing analysis suggests that Plaintiff's circumstances greatly limit his legitimate expectations of privacy.

## C.

In these circumstances, Defendant's actions do not intrude significantly or unreasonably on Plaintiff's expectations of privacy. Because the fact of testing is not at issue, Plaintiff must be arguing that the manner of testing is so significantly greater than the intrusion caused by testing itself as to make the entire process unconstitutional. "The Supreme Court has held that the degree of intrusion 'depends upon the manner in which production of the urine sample is monitored." *Wilcher*, 139 F.3d at 375 (quoting *Vernonia School District 47J v. Acton*, 515 U.S. 646, 658 (1995)).

Clearly, the direct observation method employed by Defendant is highly intrusive. *BNSF Ry.*, 566 F.3d at 208 (stating the same of a very similar method of urine collection); *see also Wilcher*, 139 F.3d at 375-76 ("the direct observation method represents a significant intrusion on . . . privacy . . . . Urination has been regarded traditionally by our society as a matter 'shielded by great privacy.'") (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 626 (1989)). It involves the close monitoring of a generally private bodily function. However, such a significant level of intrusiveness does not, per se, mean that the protocol utilized by Defendant is

---

[7] The Court recognizes that the defendant in *Barnett*, unlike Plaintiff in this case, had been convicted of a crime and was not merely awaiting trial. However, the considerations of Plaintiff in choosing to accept conditional pretrial release are similar to the considerations of those choosing probation over prison. Moreover, the decision leads to the same diminished expectation of privacy, which is the important issue for this case.

unconstitutional. Rather, this is simply one of the factors to be weighed in determining whether the Defendant's actions were reasonable.

### D.

The final prong of the analysis "is the government's interest, which must be compelling."[8] *Wilcher*, 139 F.3d at 377**.** Defendant's interest in using direct observation is quite simple: to prevent cheating on drug tests. The D.C. Circuit noted the "growth of an industry devoted to circumventing tests" and described "hundreds of different cheating products . . . the most elaborate of which is a prosthetic device [known as the Whizzinator] that looks like real human anatomy, color-matched, that can be used to deliver synthetic or drug-free urine." *BNSF Ry.*, 566 F.3d at 203. Cheating on urine based drug tests occurs in a variety of ways. Participants may add chemicals to their samples in order to counteract traces of drugs or may add water to dilute their samples, or substitute a sample from a drug-free person, or even the participant's own sample taken when they were not using drugs.

Defendant has presented significant evidence that direct observation is the best, and potentially the only, method for preventing all forms of cheating drug tests. To be sure, there are less intrusive alternatives, which are also less effective at detecting cheating. Moreover, this Court agrees that "the fact that there exists a less intrusive method of achieving the government's goal is not relevant to the Court's reasonableness analysis under the Fourth Amendment." *Wilcher,* 139 F.3d at 377.; *see also BNSF Ry.*, 566 F.3d at 206 ("And although the effectiveness of a search compared to available alternatives may be relevant to the government's interest in

---

[8] "'[C]ompelling interest' does not have the same meaning in this context as it does in other areas of constitutional law." *Wilcher*, 139 F.3d at 377. "Rather, the phrase describes an interest which appears important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy." *Veronia*, 515 U.S. at 661.

conducting the search, there is no per se requirement that the government use the least intrusive practicable means.") (citations omitted).

Plaintiff's arguments against the reasonableness of the direct observation method are not convincing. Plaintiff argues that only one percent of participants attempt to cheat the drug testing program and contend that this fact means that cheating is not wide-spread. Therefore, according to Plaintiff, direct observation to prevent cheating is unnecessary. However, other courts have uniformly rejected such an argument. *See, e.g., BNSF Ry.*, 566 F.3d at 203-04 (holding that direct observation testing was not unreasonable simply because there was no direct evidence of participants cheating in the past); *Wilcher*, 139 F.3d at 378 ("Under Supreme Court jurisprudence, the City of Wilmington need not wait for a cheating problem to develop in order to justify its use of direct observation.") (citing *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989)). This Court agrees with this logic. The relative absence of cheating under the direct observation method does not eliminate the compelling interest in protecting against it. If anything, it indicates that the direct observation method has been extremely successful in guarding against cheating. The efficacy of the program cannot be counted against its reasonableness.

Plaintiff also argues, essentially, that the direct observation method is unnecessary because there was no reasonable suspicion that he would attempt to cheat the test. In making this argument, Plaintiff distinguishes our case from *BNSF Ry.* The D.C. Circuit found direct observation reasonable, in part, because it was used only where an employee previously refused to take or failed an initial, un-monitored drug test. While the D.C. Circuit found this fact important, it was because participants who had failed one test had a much greater incentive to

cheat than those who had never failed a test. The incentive for the employees was that many employers had adopted a "two strikes and out" policy, meaning that the employee would be terminated after failing a second drug test. *Id.* at 204. Here, it is reasonable to assume that pretrial releasees could have an even greater incentive for cheating than did the parties in *BNSF Ry.* While the employees there may have lost their jobs, the pretrial releasees will be sent back to jail and may be charged with a Class A misdemeanor if they fail the drug tests. This certainly creates an equally strong incentive to cheat the test.

Plaintiff also argues that other methods of collection can prevent would-be cheaters. First, the existence of alternative methods does not make direct observation unreasonable. Moreover, the Court is persuaded by the evidence adduced by Defendant that direct observation is the best method of preventing and detecting cheating. Defendant cites the Court to a study conducted by the Government Accountability Office ("GAO") in which the GAO sent undercover investigators to attempt to cheat urine based drug tests not using the direct observation method. Those investigators, without exception, were able to successfully cheat the tests. The D.C. Circuit also relied on this study in finding that a direct observation method was reasonable to prevent against cheating. *BNSF Ry.*, 566 F.3d at 203.

### E.

The Court must now weigh all of the foregoing factors. This Court, like the D.C. Circuit, has "little difficulty concluding that direct observation furthers the government's interest in effective drug testing." *Id.* at 206. If the government's interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results. If the tests are ineffective, the

government's legitimate purposes, such as ensuring pretrial releasees show up for trial, ensuring that no crimes are committed during pretrial release and protecting the public, would be completely thwarted. Given Plaintiff's diminished expectation of privacy based upon alleged prior misconduct and circumstances and the government's compelling interest in ensuring the validity of the testing, the Court finds that the direct observation method of urine collection was reasonable despite its highly intrusive nature. This conclusion conforms with the well-reasoned analysis of the D.C. Circuit in *BNSF Ry. Id.* at 208.

## IV.

Plaintiff has also brought four state law based claims: (1) invasion of privacy by means of intrusion of seclusion; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) negligent supervision. The Court will consider each in turn.

To establish a claim for invasion of privacy based on an intrusion of seclusion, Plaintiff must prove three elements: (1) an intrusion by the defendant; (2) into a matter which the plaintiff had a right to keep private; and (3) by use of a method that is objectionable to a reasonable person. *Baggs v. Eagle-Picher Indus., Inc.*, 957 F.2d 268, 273 (6th Cir. 1992). It is certainly true that urinating is generally a private activity and being watched while urinating is objectionable to a reasonable person. Having found that it was reasonable for Defendant to use direct observation to ensure that Plaintiff did not cheat the system, however, the Court cannot now hold that Plaintiff had a right not to be watched. Such a holding would defy logic. Rather, the Court finds that the urination for drug testing in this case was not a matter which Plaintiff had a right to keep private.

The claim for intentional infliction of emotional distress also must fail. Under Kentucky

law, there are four elements for intentional infliction of emotional distress: (1) the defendant must intend to cause the plaintiff emotional distress or must at least act recklessly; (2) the defendant's conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; (3) there must be a causal connection between the defendant's conduct and the emotional distress; and (4) the emotional distress must be severe. *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996). In the present case, there is no evidence that Defendant acted with the intention of causing Plaintiff emotional distress or that Defendant acted recklessly. Rather, the evidence is apparent that Defendant's sole motivation in utilizing direct observation was to ensure that Plaintiff did not cheat. Moreover, employing this method of collection to prevent against cheating is not the type of behavior that would lead a reasonable person to exclaim, "Outrageous!" *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004). Therefore, the claim of intentional infliction of emotional distress must fail. *Id.*

Kentucky law is sparse on the claim of negligent infliction of emotional distress. However, "a touching has traditionally been required before recovery may be had for negligently inflicted emotional distress." *Steel Technologies, Inc. v. Congleton*, 234 S.W.3d 920, 928 (Ky. 2007). Plaintiff readily admits that Defendant never touched him. Therefore, Plaintiff cannot possibly recover for negligent infliction of emotional distress.

Plaintiff's final state law action is based on negligent supervision. However, the Court finds no evidence that the employees of Defendant acted in a negligent manner or did anything wrong. Rather, the employees followed the procedures of Defendant precisely and the Court has held those procedures to be reasonable. If there is no evidence of wrongdoing on the part of the

employees, there can be no claim for negligent supervision on the part of the employer.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record